1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARIA VENTURA, individually and on          No. 1:17-cv-00237-DAD-SKO
     behalf of the ESTATE OF OMAR
12   VENTURA and the HEIRS OF OMAR
     VENTURA,
13                                                ORDER GRANTING DEFENDANTS'
                       Plaintiffs,                MOTION FOR SUMMARY JUDGMENT
14
            v.                                    (Doc. No. 22)
15
     OFFICER JENNIFER RUTLEDGE;
16   UNKNOWN POLICE OFFICERS; and
     CITY OF PORTERVILLE,
17   CALIFORNIA,

18                     Defendants.

19

20          This matter came before the court on February 5, 2019 for a hearing on defendants'

21   motion for summary judgment.  (Doc. No. 22.)  Attorney Kevin Little appeared telephonically on

22   behalf of plaintiffs and attorney Bruce Praet appeared telephonically on behalf of defendants.

23   The court has considered the parties' briefs and oral arguments, and for the reasons set forth

24   below, will grant defendants' motion for summary judgment.

25                                   **BACKGROUND**

26          The facts that follow are undisputed unless otherwise noted.  Decedent Omar Ventura

27   (hereinafter "Omar") fathered two children with Martha Andrade (hereinafter "Martha"), though

28   the two were never married and did not live together.  (Doc. No. 22 at 7.)  On December 24,

                                          1

2015, Martha called 911 to report that Omar had hit her, hit his mother, Maria Ventura (hereinafter "Maria"), and smashed the window of Martha's vehicle. (Doc. No. 25-2 at ¶ 1.) Officer Jennifer Rutledge of the Porterville Police Department responded to the call as a "415V," or violent domestic disturbance. (*Id.* at ¶ 2.)

While Officer Rutledge was interviewing Martha, Martha pointed to Omar who walking up the street and exclaimed, "That's him." (*Id.* at ¶ 3.) As Omar continued to approach, Martha moved behind trash cans in the driveway. (*Id.* at ¶ 4.) Officer Rutledge gave several orders to Omar to stop, which Omar ignored. (*Id.* at ¶ 5.) As Omar approached Martha, he removed a knife from his pocket, and asked Martha, "Is this what you wanted?" (*Id.* at ¶¶ 6–7.)

Although plaintiffs do not dispute that Omar removed a knife from his pocket as he approached Martha, they do dispute whether Omar presented a threat at the time. (*Id.* at ¶¶ 10–11.) Plaintiffs contend that Officer Rutledge was at least ten yards away from Omar and was not herself endangered. (*Id.*) Plaintiffs further contend that Omar was walking normally and did not appear to be about to harm anyone. (*Id.*)

Officer Rutledge warned Omar, "Stop or I'll shoot." (*Id.* at ¶ 8.) When Omar continued to approach Martha with his knife in hand, Officer Rutledge fired two rapid shots, fatally striking Omar. (*Id.* at ¶ 9.) The parties do not dispute that Omar had advanced to less than twenty feet from Martha at the time he was shot by Officer Rutledge.[1] (*Id.* at ¶ 10.)

Plaintiffs Maria Ventura and the Estate and Heirs of Omar Ventura commenced this action against Officer Rutledge and the City of Porterville on February 16, 2017. (Doc. No. 1.) Plaintiffs' operative complaint asserts the following causes of action: (1) violation of the Fourth Amendment of the United States Constitution, based on the excessive use of force; (2) violation of the Fourteenth Amendment right to familial association; (3) municipal liability based on unconstitutional customs, policies, and practices; (4) violation of California Civil Code § 52.1 (the "Bane Act"); (5) negligence; (6) battery; and (7) wrongful death.

---

[1] At the February 5, 2019 hearing, counsel for the parties agreed that Omar was only approximately ten to fifteen feet from Martha at the time that he was shot, citing Martha's deposition testimony and the scale of the diagram Martha drew at her deposition. (*See* Doc. No. 25 at 3.)

On December 12, 2018, defendants filed the pending motion for summary judgment. (Doc. No. 22.) Therein, defendants represent that the parties met and conferred prior to the filing of the motion for summary judgment, and that plaintiffs agreed to voluntarily dismiss the *Monell* claims against the City. (*Id.* at 1.) Defendants argue that they are entitled to judgment as a matter of law as to all remaining claims because: (1) the use of force by defendants was objectively reasonable; (2) plaintiffs fail to meet the heightened "purpose to harm" standard required by the Fourteenth Amendment; (3) Officer Rutledge is entitled to qualified immunity; and (4) plaintiffs' remaining state law claims fail in the absence of a constitutional violation. (*Id.* at 2.) Plaintiffs filed their opposition to the motion for summary judgment on January 22, 2019, and defendants filed their reply on January 28, 2019. (Doc. Nos. 23, 25.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

/////

/////

/////

**ANALYSIS**

A.    **Federal Law Claims**

The Civil Rights Act provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, to prevail on a valid claim under § 1983, a plaintiff must prove that the conduct complained of was committed by a person acting under color of state law, and that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978); *Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976).

As noted above, plaintiffs assert violations of the Fourth and Fourteenth Amendments against Officer Rutledge.  The parties do not dispute that Officer Rutledge was acting under color of state law at the relevant time.  Therefore, the only remaining questions are whether Officer Rutledge deprived plaintiffs of their constitutional rights, and if so, whether she is entitled to qualified immunity.

1.    Fourth Amendment Claim

Plaintiffs first allege that Officer Rutledge employed excessive force against Omar on December 24, 2015.  A claim that a law enforcement officer used excessive force during the course of an arrest is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). Under this standard, "'[t]he force which [i]s applied must be balanced against the need for that force:  it is the need for force which is at the heart of the *Graham* factors.'"  *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)); *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).  Thus, in light of the facts and circumstances surrounding a law enforcement officer's actions, courts "must balance the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010)

(citations and internal quotations omitted); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007);

*Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *Deorle v. Rutherford,* 272 F.3d 1272, 1280

(9th Cir. 2001); *Liston*, 120 F.3d at 976. "Force is excessive when it is greater than is reasonable

under the circumstances." *Santos*, 287 F.3d at 854 (citing *Graham*, 490 U.S. 386). Accordingly,

> [a]lthough it is undoubtedly true that police officers are often forced to make split-second judgments, and that therefore not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive.

*Id.* at 853 (citations and internal quotations omitted).

In considering the pending motion for summary judgment, the following admonition of

the Ninth Circuit with respect to the use of summary judgment in cases involving claims of

excessive use of force must be kept in mind:

> Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. . . . Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."

*Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations

omitted). In the instant case, while many of the facts before this court are uncontroverted on

summary judgment, such as the nature and quantum of the deadly force utilized, as explained

below there is nevertheless a genuine dispute of material fact as to the reasonableness with which

that force was applied.

        a.     *Nature and Quality of the Intrusion*

The court begins its analysis by assessing both the type and the amount of force used. *See*

*Bryan*, 630 F.3d at 824; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Here, it

is undisputed that Officer Rutledge fired her weapon at Omar twice, fatally striking him. (*See*

Doc. No. 25-2 at ¶ 9.) Shooting a suspect with a firearm constitutes use of deadly force.

*Blanford v. Sacramento County*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005) (defining "deadly force"

as "force creating a substantial risk of causing death or serious bodily injury") (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (en banc)).  It is well established that:

> The intrusiveness of a seizure by means of deadly force is unmatched.  The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.

*A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (citations and quotation marks omitted).  Accordingly, "[d]eadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'"  *Id.* (quoting *Garner*, 471 U.S. at 11).

> b.      *Governmental Interests at Stake*

Having identified the quantum of force at issue, the court must balance the use of that force against the need for such force.  *See Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011); *Bryan*, 630 F.3d at 823; *Liston*, 120 F.3d at 976.  In analyzing the government's interests at issue, courts must consider a number of factors, including (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight, and any other exigent circumstances.  *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Deorle*, 272 F.3d at 1280.  Courts may also consider, when appropriate, whether a warning was given before force was used.  *See Deorle*, 272 F.3d at 1283–84 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.").  Ultimately, the court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."  *Hughes v. Kisela*, 862 F.3d 775, 779 (9th Cir. 2016) (internal citation and quotation marks omitted), *rev'd on other grounds*, ___U.S.___, 138 S. Ct. 1148 (2018); *Mattos*, 661 F.3d at 441.

i.   Severity of the Crime at Issue

The court first considers the severity of the crime at issue.  *Graham*, 490 U.S. at 396; *A. K. H.*, 837 F.3d at 1011; *Deorle*, 272 F.3d at 1280–81.  Here, there is no dispute that Officer Rutledge responded to the scene based on a 911 call from Martha, in which she reported that Omar had hit her, hit his mother, and smashed a vehicle window.  (Doc. No. 25-2 at ¶¶ 1–2.)  In this regard, the Ninth Circuit has observed that "'[t]he volatility of situations involving domestic violence' makes them particularly dangerous."  *Mattos*, 661 F.3d at 450 (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)); *see also Thomas v. Dillard*, 818 F.3d 864, 882 (9th Cir. 2016) (recognizing the same, but noting that the Ninth Circuit decisions "have continued to demonstrate that Fourth Amendment challenges in the context of domestic violence turn on the specific facts of the case, considered in their totality").

Here, a reasonable officer could have found that the domestic altercation was serious and still ongoing because Omar refused to obey commands from Officer Rutledge to stop and continued to advance toward Martha with a knife in his hand.[2]  Even in the light most favorable to plaintiffs, the evidence before the court on summary judgment supports the conclusion that the severity of the crime at issue was substantial.

ii.   Active Resistance or Attempts to Evade Arrest

The next governmental interest the court considers is whether Omar actively resisted arrest or attempted to evade arrest by flight.  *Deorle*, 272 F.3d at 1280.  Here, it is undisputed on summary judgment that Omar ignored Officer Rutledge's several commands for him to stop, including her specific warning to "stop or I'll shoot."  (Doc. No. 25-2 at ¶¶ 5, 8.)  On the other hand, there is no evidence before the court on summary judgment that Omar attempted to run

---

[2]  Although not precisely on point here, where the court is assessing whether there is a disputed issue of fact precluding summary judgment on the merits of plaintiffs' Fourth Amendment claim, the Ninth Circuit has found evidence of whether a domestic altercation was ongoing to be relevant in addressing qualified immunity.  *See George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (denying qualified immunity in an excessive force case in part because victim of the domestic disturbance "was unscathed and not in jeopardy when deputies arrived"); *Smith v. City of Hemet*, 394 F.3d 689, 702–03 (9th Cir. 2005) (denying qualified immunity in part because, by the time officers arrived, the suspect was "standing on his porch alone and separated from his wife.  He had no guns or other weapons in his possession and there were none in the house").

from Officer Rutledge or physically resist arrest. Overall, it does not appear that Omar's resistance was particularly aggressive or that he showed any signs of fleeing the area.

### iii. Immediate Threat to Safety

The most important governmental interest factor is whether the suspect poses an immediate threat to the safety of the officer or others. *Hughes*, 862 F.3d at 779; *A. K. H.*, 837 F.3d at 1011; *Bryan*, 630 F.3d at 826; *Smith*, 394 F.3d at 702; *see also Rodriguez v. Swartz*, 899 F.3d 719, 728–29 (9th Cir. 2018). It has been recognized that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Hughes*, 862 F.3d at 780 (quoting *Deorle*, 272 F.3d at 1281); *see also Estate of Diaz*, 840 F.3d at 605; *George*, 736 F.3d at 838; *Deorle*, 272 F.3d at 1281 ("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). Moreover, it has long been established "that the fact that the 'suspect was armed with a deadly weapon' does *not* render the officers' response per se reasonable under the Fourth Amendment." *George*, 736 F.3d at 838 (emphasis in original) (quoting *Glenn*, 673 F.3d at 872–73); *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where, according to the plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).

In moving for summary judgment, defendants contend that the evidence on summary judgment establishes Omar posed an immediate threat to Martha's safety. Specifically, Officer Rutledge arrived on the scene reasonably believing Omar had hit Martha and his mother. When Officer Rutledge confronted Omar, Omar defied the officer's orders to stop, including Officer Rutledge's specific warning to "stop or I'll shoot." Instead, Omar continued to advance toward Martha and removed a knife from his pocket while doing so.

/////

9

Nonetheless, considering the other evidence before the court on summary judgment, there is at least some dispute as to whether Omar's behavior could reasonably have been viewed as posing a threat to Martha's safety. The parties agree that Omar was less than twenty feet from Martha at the time he was shot by Officer Rutledge, which, when viewed in the light most favorable to plaintiffs, may suggest that Omar was not within striking distance of Martha. (Doc. No. 25-2 at ¶ 10.) Martha also has provided a sworn declaration stating that when Officer Rutledge drew her gun and pointed it at Omar, Martha yelled at her not to shoot. (Doc. No. 23-4 at ¶ 6.) Again, viewed in the light most favorable to plaintiffs, this would indicate Martha's subjective belief that she was not in imminent danger from Omar. Moreover, sworn declarations from Maria, Martha, and a neighbor, Jorge Luis Campos Castro, each state that Omar was walking "normally" at the time he was shot by the officer. (Doc. No. 23-3 at ¶¶ 5, 8; Doc. No. 23-4 at ¶¶ 5, 8; Doc. No. 23-5 at ¶ 4.) The declarations from these individuals further attest that even if Omar had been holding a knife in his hand, they did not observe him brandishing it or raising his hands in a threatening manner. (Doc. No. 23-3 at ¶¶ 5, 8; Doc. No. 23-4 at ¶¶ 5, 8; Doc. No. 23-5 at ¶ 4.)

Defendants argue in their reply that the notion that Omar did not brandish the knife is a sham, because Maria, Omar's mother, previously provided a statement that Omar was looking at Martha while "gesturing" with the knife in his hand. (Doc. No. 25 at 2–3; Doc. No. 22-7 at 4.)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). A district court may "disregard 'sham' affidavits that contradict deposition testimony submitted solely to generate [an] issue of fact for summary judgment purposes." *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997). At the same time, however, the Ninth Circuit has advised that the "sham affidavit rule" must be applied with caution. *Van Asdale*, 577 F.3d at 998. There are thus two important limitations on a district court's discretion to disregard a sham affidavit. *Id.* First, the district court must make a factual determination that the contradiction was actually a "sham"; and second, the inconsistency between the prior testimony

and subsequent affidavit must be clear and unambiguous. *Id.* at 998–99. The non-moving party is not prohibited from elaborating on or clarifying prior testimony and "minor inconsistencies that result from an honest discrepancy, mistake, or newly discovered evidence." *Id.* at 999.

The court finds that neither limitation is satisfied under the circumstances presented here. Defendants insinuate that Maria's declaration—submitted in conjunction with plaintiffs' opposition to the pending motion for summary judgment—is a sham, because Maria purportedly admitted in an interview with a detective on the date of the shooting that Omar was "gesturing" toward Martha with the knife. A review of Maria's statements made during that interview in context, however, reveals that it is not as straightforward as defendants suggest:

> Q: And when he was talking – what was he doing with his hands?
>
> A: When he was coming from over there, he had his hands in his jacket. When he got here I just saw him saying – "that's what you want, that's what you want?"
>
> Q: With his hands up?
>
> A: Yeah. I don't know.
>
> Q: With his right hand or his left hand?
>
> A: The left one I think.
>
> Q: Ok. So then with his hand out, he was – was his hand open or closed? If you don't recall, you don't recall.
>
> A: I don't remember. I don't remember.
>
> Q: And to who was he just gesturing with his hand?
>
> A: To her.
>
> Q: To her? Ok. And did he turn around or was he looking at Martha the whole time?
>
> A: No. He was looking at Martha, but he was also looking at me and the little boy.

(Doc. No. 22-7 at 4.) Read in context, Maria's prior statement is most accurately characterized as equivocal. She admits more than once that she does not remember certain details about the placement of Omar's hands, and the term "gesturing" was not used by Maria, but was instead provided by the detective conducting the interview. (*See id.*) Under these circumstances, the

court finds that the purported contradiction in Maria's statements advanced by defendants is not in fact a sham, and the inconsistency is neither clear nor unambiguous. *Van Asdale*, 577 F.3d at 998–99.

Notwithstanding the individual or cumulative strength of plaintiffs' evidence, whether Omar was within striking distance and whether Omar threatened Martha with the knife are inferences from the evidence that can only appropriately be drawn by the factfinder. *Green*, 751 F.3d at 1049. Here, drawing all inferences from the evidence before the court on summary judgment in plaintiffs' favor, the court concludes that there is at least some evidence from which a reasonable jury could conclude that Omar posed no immediate threat to the safety of Officer Rutledge, Martha, or others, and that the use of deadly force against him was therefore unwarranted and carried out in violation of the Fourth Amendment.

### 2. Qualified Immunity

Above, the court has concluded that based upon the evidence presented by the parties, a reasonable trier of fact could find in plaintiffs' favor with respect to their Fourth Amendment claim. Defendant's motion for summary judgment based on the assertion that the deadly force employed was objectively reasonable under the circumstances of this case must therefore be denied. However, defendant Rutledge has also moved for summary judgment in her favor on qualified immunity grounds.[3] (Doc. No. 22 at 14–17.) Faced with this argument and given the court's determination that there are triable issues of fact to be resolved in determining whether there has been a violation of a constitutional right, the court must necessarily proceed to the question of whether the rights at issue were clearly established prior to this shooting. *See Hughes*, 862 F.3d at 783 ("In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.") (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)); *A. K. H.*, 837 F.3d at 1013 ("Although we

---

[3] "Qualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

conclude Officer Villarreal's actions violated the Fourth Amendment, we may affirm the district court's denial of qualified immunity only if 'the right which was violated was clearly established at the time of the violation.'") (quoting *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) (internal quotations omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003); *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001). When presented with a qualified immunity affirmative defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time of the event in question. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the two prongs of the analysis announced in *Saucier* in any particular order).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Hughes*, 862 F.3d at 782. In this regard, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also Hughes*, 862 F.3d at 783; *A. K. H.*, 837 F.3d at 1013; *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional." (quoting *Saucier*, 533 U.S. at 202)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (emphasis in original) (quoting *al-Kidd*, 563 U.S. at

742).  This inquiry must be undertaken in light of the specific context of the particular case, rather than as a broad general proposition.  *Id.*; *Saucier*, 533 U.S. at 201.[4]

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Mullenix*, 136 S. Ct. at 308.  "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018) (internal citation and quotation marks omitted).

This court is, of course, bound by the Supreme Court's decision in *Kisela*.  There, a police officer (defendant–petitioner Kisela) sought summary judgment on the ground that he was entitled to qualified immunity for his alleged use of excessive force in shooting Amy Hughes (plaintiff–respondent).  According to the majority opinion, after Kisela received a report that Hughes had been "engaging in erratic behavior with a knife," he observed her holding a large kitchen knife as she took steps toward Sharon Chadwick, another woman who was standing nearby.  *Id.* at 1151.  Hughes stopped no more than six feet from Chadwick.  *Id.*  Hughes refused to drop the knife, despite officers' repeated commands for her to do so.  *Id.*  Fearing that Hughes posed an imminent threat to the other woman, Kisela fired four shots through a chain link fence and injured Hughes.  *Id.*  Although Hughes appeared calm and Chadwick stated in an affidavit that she did not feel endangered at any time, *id.*, the majority concluded that at the time of the shooting, Kisela's actions in shooting Hughes did not violate clearly established law, and that qualified immunity therefore shielded Kisela from liability.  *Id.* at 1153.

/////

---

[4]  It should be noted that the Supreme Court has acknowledged that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *District of Columbia v. Wesby*, ___U.S.___, 138 S. Ct. 577, 590 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, (2004)); *Kisela*, 138 S. Ct. at 1153; *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (concluding that the Eighth Amendment violation was "obvious" so no materially similar case was required for the right to be clearly established).

The similarities between the undisputed facts on summary judgment in the present case and those in *Kisela* are compelling. In fact, the imminence of the danger to a third party is arguably more apparent under the undisputed facts before the court here than it was in *Kisela*. For instance, it is undisputed here that Omar had hit Martha[5] earlier that day, and that Martha subsequently placed the 911 call in fear:

> Q:     And then did you call 911?
>
> A:     I did.
>
> Q:     Why?
>
> A:     Because I was scared.
>
> Q:     Of what?
>
> A:     Of him.
>
> Q:     Why?
>
> A:     Because he broke my window and he hit me.

(Doc. No. 22-3 at 6.) In *Kisela*, by contrast, the officers present at the time of the shooting were responding merely to a "check welfare" call; no crime had been reported. *Kisela*, 138 S. Ct. at 1157 (Sotomayor, J., dissenting).

Plaintiffs argue that the Supreme Court's decision in *Kisela* is not dispositive here because the Supreme Court in *Kisela* analyzed the state of the law as it stood in 2010, five years before the events at issue in this case. (Doc. No. 23 at 7 n.1.) However, plaintiffs fail to identify any court decisions in the intervening years clearly establishing that Omar's right under the Fourth Amendment to be free from the excessive use of deadly force by police would be violated when he was shot and killed as he advanced toward an individual he had earlier that day assaulted, while carrying a drawn knife and while defying specific police orders to stop. Plaintiffs primarily rely on the decision in *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1002 (9th Cir. 2017), a Ninth Circuit decision that was issued after the tragic events at issue in this case occurred. (Doc. No. 23

---

[5] Although it is undisputed that Martha reported to 911 that Omar had hit her and his mother, Martha testified at her deposition that she did not in fact see Omar hit his mother, but stated so to 911 "[b]ecause I thought if I said that they would get there faster." (Doc. No. 22-3 at 6.)

at 7–8.)  Because it was issued after this shooting, the decision in *Gelhaus* "could not have given fair notice to [Officer Rutledge] because a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious." *Kisela*, 138 S. Ct. at 1154 (quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) ("The parties point to a number of other cases in this vein that postdate the conduct in question. . . . These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry."); *Reese v. County of Sacramento*, 888 F.3d 1030, 1039 (9th Cir. 2018).

Even setting aside the fact that the decision in *Gelhaus* postdates the events at issue here, the contention that *Gelhaus* should direct the court's analysis in this case is unpersuasive. *Gelhaus* involved a 13-year-old boy who was not suspected of engaging in any criminal conduct, but had been seen carrying what appeared to be a gun.  871 F.3d at 1002.  An officer yelled at the boy to "drop the gun," but did not warn the boy that he would be shot if he failed to comply.  *Id.* Although there was a dispute as to whether the boy raised the gun, the officer shot and killed the boy.  *Id.* at 1003.  No bystanders were present at the shooting.  *Id.* at 1004.  The Ninth Circuit held under those circumstances that a reasonable jury could find that the officer's use of deadly force was not objectively reasonable, and that the district court properly denied defendants' motion for summary judgment on qualified immunity grounds.  *Id.* at 1021–22.

Plaintiffs argue that *Gelhaus* clearly established that using deadly force against a person who is armed and noncompliant, but who is not pointing the weapon at officers or making a threatening gesture with it, violates the Fourth Amendment.  (Doc. No. 23 at 7–8.)  But the distinctions between the facts here and those in *Gelhaus* are self-evident:  the officers came across the teenage boy while on routine patrol, and not in response to a report of a crime; the boy was shot standing next to an open field with no other individuals present in the area; and the boy was not warned that he would be shot if he failed to comply with the officer's command to drop the gun.  *Gelhaus*, 871 F.3d at 1010–11.  *Gelhaus* is therefore not a case involving a comparable degree of apparent danger to others as that posed under the undisputed facts on summary judgment here.

Although the court finds that a reasonable jury could conclude that Officer Rutledge's shooting of Omar Ventura violated the Fourth Amendment, because the unconstitutional nature of her conduct was not clearly established at the time of the events at issue here, the court concludes that under Supreme Court precedent Officer Rutledge is entitled to summary judgment on qualified immunity grounds with respect to plaintiffs' claims brought under the Fourth Amendment.[6]

---

[6] In legal circles and beyond, one of the most debated civil rights litigation issues of our time is the appropriate scope and application of the qualified immunity doctrine, particularly in cases of deaths resulting from police shootings. *See, e.g.*, Nicolas Sonnenburg, *Pressure Mounts on Justices in Qualified Immunity Cases*, SAN FRANCISCO DAILY J., Apr. 12, 2019, at 1; Alan K. Chen, *The Intractability of Qualified Immunity*, 93 NOTRE DAME L. REV. 1937, 1937 (2018) ("[I]t is fair to say that the doctrine has now puzzled, intrigued, and frustrated legal academics, federal judges, and litigators for half a century."). Many legal scholars and others have called for the doctrine to be revisited and eliminated, significantly restricted, or at the very least altered. *See, e.g.*, Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018); Cato Institute, *Qualified Immunity: The Supreme Court's Unlawful Assault on Civil Rights and Police Accountability* (March 1, 2018 policy forum). For years, justices of the Supreme Court, as well as judges of the lower federal courts, have been critical of the application and expansion of the doctrine. *See, e.g.*, *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J, dissenting) ("The majority today . . . tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished. Because there is nothing right or just under the law about this, I respectfully dissent."); *Ziglar v. Abbasi*, ___U.S.___, ___, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Anderson v. Creighton*, 483 U.S. 635, 647 (1987) (Stevens, J., dissenting) ("The Court stunningly restricts the constitutional accountability of the police by creating a false dichotomy between police entitlement to summary judgment on immunity grounds and damages liability for every police misstep, by responding to this dichotomy with an uncritical application of the precedents of qualified immunity that we have developed for a quite different group of high public office holders, and by displaying remarkably little fidelity to the countervailing principles of individual liberty and privacy that infuse the Fourth Amendment."); *Zadeh v. Robinson*, ___F.3d___, 2019 WL 2752310, at *16 (5th Cir. July 2, 2019) (Willett, J., concurring) ("Qualified immunity aims to balance competing policy goals. And I concede it enjoys special favor at the Supreme Court, which seems untroubled by any one-sidedness. Even so, I add my voice to a growing, cross-ideological chorus of jurists and scholars urging recalibration of contemporary immunity jurisprudence and its 'real world implementation.'"); *Manzanares v. Roosevelt Cty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1293–94 n.10 (D.N.M. 2018) (critiquing the Supreme Court's application of qualified immunity in many respects, among them the application of the clearly established law requirement, noting: "Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way"). While there is so much more that could, and perhaps should, be said about the current state of this judicially created doctrine, the undersigned will stop

3.      Fourteenth Amendment Claim

Plaintiffs, the surviving parent and heirs of the decedent, also assert a Fourteenth

Amendment claim against Officer Rutledge for the alleged deprivation of their rights to familial

association.  Government conduct may offend due process only when it "'shocks the conscience'

and violates the 'decencies of civilized conduct.'"  *County of Sacramento v. Lewis*, 523 U.S. 833,

846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)); *see also Porter v.*

*Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  An officer's conduct shocks the conscience if he or

she acted with either (1) deliberate indifference, or (2) a purpose to harm the decedent for reasons

unrelated to legitimate law enforcement objectives.  *Porter*, 546 F.3d at 1137; *Moreland v. Las*

*Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998).  The appropriate standard for

liability on a Fourteenth Amendment claim in a given case turns on whether the officer had an

opportunity for actual deliberation.  *Porter*, 546 F.3d at 1138; *accord Tennison v. City & County*

*of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610

F.3d 546, 554 (9th Cir. 2010)); *accord Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014); *see*

*also Gonzalez v. City of Anaheim,* 747 F.3d 789, 797 (9th Cir. 2014) (*en banc*); *Porter*, 546 F.3d

at 1139 (holding that the purpose to harm standard is applied where officers found themselves

confronting "fast paced circumstances presenting competing public safety obligations").

/////

_____

here for today.  In short, this judge joins with those who have endorsed a complete re-examination of the doctrine which, as it is currently applied, mandates illogical, unjust, and

puzzling results in many cases.  However, the Supreme Court's decision in *Kisela* is, of course, binding on this court.  The circumstances presented there, where the Supreme Court held the

officer was entitled to qualified immunity on summary judgment, posed a significantly lesser degree of danger to a third party than those presented in this case.  Accordingly, application of the

holding in *Kisela* to the undisputed evidence in this case dictates the result reached herein.

Plaintiffs argue that the deliberate indifference standard should apply here, because "although noncompliant, [Omar] was walking normally toward his house, and the persons toward whom he was walking implored [Officer Rutledge] not to shoot him." (Doc. No. 23 at 8.) Plaintiffs speculate that, "[v]ery arguably, Officer Rutledge had more than enough time to deliberate, as she herself was not in any imminent danger." (*Id.*)

Plaintiffs' argument in this regard is unpersuasive. Whether or not *Officer Rutledge* was in any imminent danger is not evidence of an opportunity to deliberate, given that Officer Rutledge's subjective belief was that *Martha* was in imminent danger. Here, the undisputed evidence on summary judgment establishes that Officer Rutledge faced a quickly-evolving situation in deciding to use her weapon. Indeed, the Porterville Police Department incident report before the court on summary judgment indicates that Officer Rutledge arrived on the scene at 16:21:46, and that shots were fired at 16:23:43. (*See* Doc. No. 22-5 at 2.) The parties do not dispute that Omar walked up to the scene sometime after Officer Rutledge had arrived. (*See* Doc. No. 22-1 at ¶ 3.) Officer Rutledge's entire interaction with Omar therefore unfolded in less than two minutes. Given the rapidly evolving situation, the purpose to harm standard applies to plaintiffs' Fourteenth Amendment claim. *See Porter*, 546 F.3d at 1139 (finding actual deliberation not practical where a five-minute altercation between officers and the victim evolved quickly and forced the officers to make "repeated split-second decisions"); *see also Chavez v. Las Vegas Metro Police Dep't*, 648 Fed. App'x 657, 658 (9th Cir. 2016) ("The district court correctly held that because the officers encountered a "rapidly escalating" situation that quickly evolved within minutes, Chavez was required to show that the officers acted with a "purpose to harm" unrelated to legitimate law enforcement objectives."); *Shirar v. Guerrero,* 673 Fed. App'x 673, 675 (9th Cir. 2016) ("The purpose-to-harm standard applies here because only a minute elapsed between Guerrero's call for an ambulance for Shirar and his second radio call that shots had been fired.");[7] *Wilkinson*, 610 F.3d at 554–55 ("[B]ecause Torres was in a rapidly evolving situation requiring him to make "split-second judgments," we need not scrutinize as closely as the district

---

[7] Citation to these unpublished Ninth Circuit opinions is appropriate pursuant to Ninth Circuit Rule 36–3(b).

court did Torres' decision about how best to minimize the risk to his own safety and the safety of others."); *Atkinson v. County of Tulare*, 790 F. Supp. 2d 1188, 1208 (E.D. Cal. 2011) (applying purpose to harm standard where "the entire incident lasted only a few minutes").

The court finds that no evidence submitted by the parties on summary judgment supports a finding that Officer Rutledge acted with a purpose unrelated to legitimate law enforcement objectives. *See Porter*, 546 F.3d at 1140 (explaining that a purpose to harm unrelated to legitimate law enforcement objectives is found where force is used against a suspect only to "teach him a lesson" or to "get even"); *see also Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018) (explaining that a legitimate law enforcement objective is lacking when the officer has ulterior motives for using force against a suspect, such as to bully or get even, or when an officer uses force against a clearly harmless or subdued suspect); *A.D. v. California Highway Patrol*, 712 F.3d 446, 457 (9th Cir. 2013); *Wilkinson*, 610 F.3d at 554. Here, there is no evidence suggesting that Officer Rutledge had any specific animus toward Omar or that she otherwise had any motive other than law enforcement objectives. Defendants' motion for summary judgment will therefore be granted with respect to plaintiffs' Fourteenth Amendment claim as well.

**B.      State Law Claims**

Because the court grants summary judgment on the federal law claims in defendants' favor, the court will decline to exercise supplemental jurisdiction over plaintiffs' state law claims and will instead dismiss those claims without prejudice to their re-filing in state court. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

/////

/////

/////

/////

/////

/////

**CONCLUSION**

For the reasons set forth above,

1.  Defendants' motion for summary judgment (Doc. No. 22) is granted as to plaintiffs' federal law claims brought under 42 U.S.C. § 1983;

2.  The state law claims are dismissed without prejudice; and

3.  The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:  __**July 16, 2019**__                    _____

                                                UNITED STATES DISTRICT JUDGE